**In re SABRATEK CORPORATION, et al., Debtors.**

**Sabratek Corporation, et al., Plaintiff,**

**v.**

**LaSalle Bank, N.A. and Ralin Medical, Inc., Defendants.**

**Bankruptcy Nos. 99–4414 MFW to 99–4418 MFW. Adversary No. 00–616 MFW.**

United States Bankruptcy Court, D. Delaware.

Nov. 16, 2000.

Laura Davis Jones, Rachel S. Lowy, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, for Sabratek Corporation.

James H.M. Sprayragen, Matthew N. Kleiman, Jonathan A. Carson, Kirkland & Ellis, Chicago, IL, Special Counsel for Sabratek Corporation.

Laurie Selber Silverstein, William A. Hazeltine, Potter, Anderson & Corroon LLP, Wilmington, Christopher B. Conner, Ernst A. Halperin, Folger, Levin & Kahn LLP, San Francisco, CA, for Ralin Medical, Inc.

Maria Aprile Sawczuk, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Jill L. Uylaki, Foley & Lardner, Chicago, IL, Counsel for LaSalle Bank, N.A.

Neil B. Glassman, Jeffrey M. Schlerf, Elio Battista, Jr., the Bayard Firm, Wilmington, Martin J. Bienenstock, Weil, Gotshal & Manges LLP, New York City, for Statutory Creditors' Committee.

Daniel K. Astin, Maria D. Giannarakis, Philadelphia, PA, Office of United States Trustee.

### *OPINION*[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the motion of Sabratek Corporation and its affiliates ("the Debtors") for a preliminary injunction to enjoin Ralin Medical, Inc. ("Ralin") from continuing an action against LaSalle Bank, N.A. ("LaSalle") in Illinois state court in which Ralin seeks to draw on a letter of credit which the Debtors established with LaSalle. We conclude that such an injunction is not warranted and, therefore, deny the Motion.

### I. *BACKGROUND*

On about June 1, 1999, the Debtors and Ralin entered into the Registration Rights Agreement pursuant to which the Debtors purchased Ralin's subsidiary, LifeWatch. The Agreement provided that the Debtors would pay Ralin between $28 and $31 million for LifeWatch. The Debtors were to pay Ralin $12 million immediately and transfer 900,000 shares of unregistered Sabratek stock into two escrow accounts. The Debtors agreed to register the stock within 15 days so that it could be sold-over the next 13 months. *Registration Rights Agreement*, § 2.01 et seq. Ultimately, Ra-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

lin was to receive between $16 and 19 million from the sale of the stock. *Registration Rights Agreement*, § 8.01. If the stock sold for more than $19 million, the balance of the money would go to the Debtors; if the stock sold for less than $16 million, Ralin was entitled to the difference and could draw the balance against an $8 million letter of credit which the Debtors established with LaSalle. *Registration Rights Agreement*, § 8.02. Under the original agreement, Ralin had no right to payment from the sale of the stock until July 1, 2000.

On May 28, 1999, LaSalle sent a letter to Ralin which notified Ralin that the Debtors had established the irrevocable letter of credit. The letter also specified that, if Ralin sought to draw against the letter of credit, it would have to recite the following in its notice:

> Sabratek Corporation defaulted on its payment obligation pursuant to Registration Rights Agreement section 8.02 dated on or about June 1, 1999, between Sabratek Corporation and Ralin Medical, Inc. Ralin Medical, Inc. is not in material breach of any of its obligations under the Registration Rights Agreement and is demanding payment under this letter of credit.

It is uncontested that the Debtors failed to timely register the stock as required by the Registration Rights Agreement. Even after the Debtors belatedly filed their registration statement, they withdrew it on August 23, 1999. To resolve their disagreement as to whether the breach permitted Ralin to immediately draw against the letter of credit, the Debtors and Ralin entered into a Forbearance Agreement on October 5, 1999, in which Ralin agreed that it would not commence any legal action to enforce its rights, if any, under the letter of credit until after the original expiration date in the Registration Rights Agreement (July 1, 2000). The Forbearance Agreement provided, however, that if the Debtors filed for bankruptcy, or were adjudicated insolvent, Ralin could immediately demand the balance due it, draw on the letter of credit, or both. *Forbearance Agreement*, § 2. LaSalle signed the Forbearance Agreement, acknowledging Section 1 of the parties' new agreement.[2]

On December 17, 1999, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. On January 6, 2000, Ralin sent a demand to LaSalle seeking payment of the $8 million letter of credit. Ralin's letter stated, as required, that: "Sabratek Corporation defaulted on its payment obligation pursuant to Registration Rights Agreement Section 8.02. . . ." LaSalle refused to pay, asserting that Ralin's letter constituted fraud because it was not possible for the Debtors to have defaulted under section 8.02 since payment was not due under that section until July 1, 2000. As a result of LaSalle's refusal to pay, Ralin initiated suit against LaSalle in Illinois state court in which it sought payment under the letter of credit ("the Illinois Action").

The Debtors initiated this adversary proceeding to enjoin the Illinois Action. The Debtors filed a motion for a preliminary injunction to restrain Ralin from con-

---

2. Section 1 of the Forbearance Agreement provides: "Ralin hereby agrees that it will not commence the True–Up procedure or draw on the Letter of Credit until July 1, 2000." Sabratek and LaSalle each confirm that Ralin will have the right to commence the True–Up Procedure starting on July 1, 2000 and, in the event that Ralin does so and Sabratek does not fully comply with its True–Up obligations in a timely manner as contemplated by the Registration Rights Agreement, Ralin will have a right to draw on the Letter of Credit. The foregoing provision is not intended to amend the terms of the True–Up procedure or the Letter of Credit, but merely confirms the original agreement of the parties to the Registration Rights Agreement and the Letter of Credit. Sabratek specifically acknowledges and agrees that Ralin's right to commence the True–Up Procedure on July 1, 2000 shall be absolute and unconditional, and shall apply regardless of the occurrence or non-occurrence of any events (including, without limitation, the bankruptcy of Sabratek), unless Ralin has materially breached the Registration Rights Agreement.

tinuing the Illinois Action until this Court decides whether to grant the Debtor's request for a permanent injunction. LaSalle supports the Debtors' request. The Debtors, LaSalle and Ralin have submitted briefs, and the Court has heard oral argument. The Creditors' Committee filed a statement which does not take a position on the injunction request. Rather, the Committee seeks to have the proceeds of the letter of credit held in escrow, pending determination of an avoidance action which, it asserts, it will commence against Ralin, on behalf of the estate.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § 1334 and 157(b)(1), (b)(2)(A), and (O).

## III. *DISCUSSION*

### A. *The Standard for Granting an Injunction*

■ In determining whether to grant a preliminary injunction, courts consider four factors:

1) the likelihood that the plaintiff will prevail on the merits at final hearing;
2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of;
3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is granted; and
4) the public interest.

*Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994); *Merchant & Evans, Inc. v. Roosevelt Bldg. Products Co., Inc.*, 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191–92 (3d Cir.1990). The court should issue the injunction only if the plaintiff produces evidence that all four factors favor granting the injunction. *Duraco*, 40 F.3d at 1438; *Merchant & Evans*, 963 F.2d at 632–33;

*ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987).

### 1. The Likelihood that the Debtors Will *Prevail on the Merits*

To succeed in obtaining a preliminary injunction, the Debtors must establish that they are likely to convince the Court to issue a permanent injunction of the Illinois Action. The Illinois Action is a suit between two non-debtor parties, Ralin and LaSalle, which does not involve any property of the estate. *See Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586, 589 (5th Cir.1987) ("It is well established that a letter of credit and the proceeds therefrom are not property of the debtor's estate under 11 U.S.C. § 541"); *In re W.L. Mead, Inc.*, 42 B.R. 57, 60 (Bankr.N.D.Ohio 1984); *In re M.J. Sales & Distrib. Co., Inc.*, 25 B.R. 608, 614 (Bankr.S.D.N.Y.1982).

To enjoin such a suit, the Debtors rely on cases under section 105 which seek to extend the stay or enjoin suits against parties related to a debtor. However, those cases require a showing of an adverse impact on the estate if the suit continues. Even if Ralin is successful, the Illinois Action will not really impact the amount of claims against the estate—it will merely substitute LaSalle for Ralin as the holder of this claim.

The Debtors argue that if Ralin succeeds it will increase the secured claims against the Debtors' estates because all of LaSalle's claims are secured. However, this is not correct. LaSalle already has a secured claim, albeit a contingent secured claim, against the estate for its obligation under the letter of credit. That claim arose when the letter of credit was posted in 1999.

There are three cases which are analogous to the case presently before the Court. *Leisure Dynamics, Inc. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago (In re Leisure Dynamics, Inc.)*, 33 B.R. 171, (Bankr.D.Minn.1983); *North Shore & Central Illinois Freight Co. v.*

*American Nat'l Bank and Trust Co. Of Chicago (In re North Shore & Cent. Illinois Freight Co.)*, 30 B.R. 377 (Bankr. N.D.Ill.1983); *Page v. First Nat'l Bank of Maryland (In re Page)*, 18 B.R. 713 (D.D.C.1982).

In *Leisure Dynamics*, the Debtor procured a letter of credit from the Bank so that it could enter into a purchase agreement with a third-party (Seller). 33 B.R. at 172. After the Debtor filed bankruptcy, the Seller sought payment from the Bank under the letter of credit. The Debtor filed an adversary proceeding in the bankruptcy court in which it sought to enjoin the Bank from paying the Seller under the letter of credit. The Court held that the letter of credit is not property of the estate and the Debtor has no interest in either the letter or its proceeds. The Bank would pay the Seller with its own assets, and the Bank would then assert its own claim against the Debtor. "Although this then results in [the Bank] having a larger claim against [the Debtor], that claim will not divest [the Debtor] of any property." *Id.* at 172–73. Therefore, the Court dismissed the action.

In *North Shore*, the Debtor sought to enjoin the Bank from disbursing money under a letter of credit. 30 B.R. at 377–78. The Court found that a letter of credit is not property of the estate under section 541. After noting the important commercial function of letters of credit, the Court refused to enjoin the Bank from making payment to a third party under a stand-by letter of credit. *Id.* at 379.

In *Page*, an individual and her limited partnership, both Debtors, procured a letter of credit from the Bank. 18 B.R. at 714. To secure the letter of credit the Debtors pledged a $100,000 certificate of deposit and second deed of trust on real estate. After the Debtors filed for bankruptcy, a creditor sought to draw on the letter of credit. The Debtors sought an injunction. The Court found that drawing on the letter of credit will not divest the estate of property since neither the letter of credit nor its proceeds are property of the estate. Although drawing on the letter will immediately give rise to a claim by the Bank against the Debtors pursuant to the indemnification obligations, the Bank's liens were already perfected, so drawing upon the letter of credit did not create or perfect a lien. *Id.* at 714–16. Therefore, the Court held that no injunction was warranted.

We similarly conclude that permitting the draw on the letter of credit in this case will not have the type of adverse impact on the estate which is required for the extraordinary remedy of an injunction of a suit involving non-debtors and no property of the estate. Therefore, as did the Courts in *Leisure Dynamics, North Shore,* and *Page,* we conclude that the Debtors are not likely to succeed in establishing their likelihood of success on the merits of their complaint for a permanent injunction.

### 2. The Debtors' Irreparable Harm

The Debtors assert that permitting Ralin to continue the Illinois Action will cause them irreparable harm because they are not defendants in the Illinois Action and, therefore, cannot be heard in that forum. While LaSalle raised the same defenses in the Illinois Action that the Debtors would, the Debtors assert that they cannot be certain that LaSalle will defend itself with the same zeal as they would because LaSalle does not have as much at stake.

If the Debtors' rights are being affected by the Illinois Action, the Debtors could file a motion to intervene in the Illinois Action. *See* 735 Ill. Comp. Stat. § 2–408(a), (b) (2000).[3] Alternatively, the

---

3. 735 Ill. Comp. Stat. § 2–408(a), (b) (2000) provides:

    (a) Upon timely application anyone shall be permitted as of right to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or

Debtors could consent to relief from the automatic stay to permit LaSalle to join the Debtors as third-party defendants in that Action. *See* 11 U.S.C. § 362(d) and 735 Ill. Comp. Stat. § 5/2–406(b)(2000).[4] It would be inequitable for this Court to enjoin the Illinois Action now where the Debtors failed to pursue all avenues to be heard in the that Action.

■ Further, if the Debtors are not afforded the opportunity to litigate their rights in the Illinois Action, any decision in that Action will not collaterally estop them from bringing suit against Ralin. One of the requirements of res judicata or claim preclusion is that the party against whom preclusion is asserted had a "full and fair opportunity" to litigate the claim in the first action. *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

Ultimately, we conclude that the Debtors will not suffer any irreparable harm if their motion for an injunction is not granted. Even if the Debtors and LaSalle are correct that Ralin's call on the letter of credit was premature, the passage of time may have cured that issue. Because July 1, 2000, has now passed, it appears that Ralin could now call on the letter of credit under the terms of the original Registration Rights Agreement. At this point, the stock at issue is not worth $16 million.

Therefore, it appears that Ralin would be entitled to draw on the letter of credit for the full $8 million.

### 3. *Ralin's Irreparable Harm*

The Debtors assert that granting the injunction will not cause irreparable harm to Ralin because Ralin will still have the opportunity to litigate its rights in this Court (through the claims process or by adversary proceeding). Ralin responds that it will suffer if the injunction is granted because its inability to collect the $8 million at issue has slowed its ability to fund its internet initiative. Granting the injunction will force Ralin to forego those business opportunities.

■ Plaintiffs could always assert that any decision which delays a final adjudication of their rights causes irreparable harm because the money at issue could always be used on new business opportunities. Normally this alone is not sufficient to constitute irreparable harm. This case is different from most, however, because this case is based on a letter of credit.

■ Parties insist upon receiving letters of credit specifically so that they will not have to wait for payment or, even worse, sue and wait for payment. Under Illinois Law,[5] if the documents presented by the beneficiary of a letter of credit conform to the requirements of the letter of credit, the issuer may not refer to the underlying contract between its customer and the beneficiary to determine whether to honor the beneficiary's demand for payment.

judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer.
  (b) Upon timely application anyone may in the discretion of the court be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

**4.** 735 Ill. Comp. Stat. § 5/2–406(b), titled "Bringing in new parties—Third-party proceedings," provides:

  (b) "Within the time for filing his or her answer or thereafter by leave of court, a defendant may by third-party complaint bring in as a defendant a person not a party to the action who is or may be liable to him or her for all or part of the plaintiff's claim against him or her."

**5.** The Registration Rights Agreement provides that it is governed by Illinois law.

*Village of Long Grove v. Austin Bank of Chicago,* 268 Ill.App.3d 70, 205 Ill.Dec. 900, 644 N.E.2d 456, 458–59 (1994); *Jupiter Orrington Corp. v. Zweifel,* 127 Ill.App.3d 559, 82 Ill.Dec. 946, 469 N.E.2d 590, 592 (1984). This rule is known as the independence principle, and ordinarily, the rule is "pay first, litigate later." *Eakin v. Continental Illinois National Bank & Trust Co.,* 875 F.2d 114, 116 (7th Cir.1989).

■ Consequently, we conclude that any delay in Ralin's right to draw on the letter of credit constitutes "irreparable harm" because it eliminates the benefit of having obtained the letter of credit—the assurance of prompt payment.

#### 4. *The Public Interest*

The Debtors assert two public interests favor issuance of an injunction: promoting a successful reorganization and preserving the integrity of letter of credit transactions. Ralin responds that the bankruptcy case is not a reorganization but rather a liquidation. The Debtors have already sold many assets and plan to sell substantially all of their remaining assets. We agree that this case is not a reorganization, but a liquidation of the Debtors' assets. Therefore, the public interest in favor of reorganization is not implicated in this case.

The Debtor argues that public policy favors enjoining the draw on the letter of credit by Ralin because Ralin's action is fraudulent. However, to so conclude would require that we decide the underlying merits of the Illinois Action. Since that action is between two non-debtors and involves no property of the Debtors, we decline to make any such decision.

Ralin asserts that granting an injunction does not promote letter of credit transactions since they are used to avoid litigation. We agree. Again, the rule is "pay first, litigate later." We, therefore, conclude that the public policies behind letter of credit transactions do not favor issuance of an injunction.

We also note a third public interest which is implicated: permitting state courts to decide important issues of state law in cases between two non-debtors.

For the foregoing reasons, we conclude that public policy favors denying the Debtors' motion for an preliminary injunction.

#### B. *Holding Proceeds from the Illinois Action in Escrow*

■ If Ralin is successful in the Illinois Action and is permitted to draw upon the letter of credit, the Committee seeks to have the proceeds held in an escrow account because, it asserts, it has a fraudulent conveyance action against Ralin. Aside from its statement that the proceeds from the letter of credit are estate property under section 541(a)(3), the Committee's motion relies solely upon this Court's equitable powers. The Committee's assertion that they have a cause of action against Ralin is not enough to warrant injunctive relief. Therefore, we deny the Committee's request.

■ The injunctive relief which the Committee seeks is in the nature of a prejudgment sequestration or attachment under Federal Rules of Civil Procedure 64 and 65, as incorporated in the Federal Rules of Bankruptcy Procedure 7064 and 7065. Such relief is an extraordinary remedy and should be granted sparingly. *See Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 340, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) ("[a] preliminary asset-freeze order … would rank and operate as an extraordinary remedy").

Moreover, the argument in support of prejudgment seizure is even more questionable here where the Committee has not even filed suit. Instead, the Committee merely recites allegations to support a cause of action which it may, or may not, file in the future. Nor has the Committee alleged, let alone proved, any basis for its belief that the money would not be available in the event that: a) Ralin succeeds in

the Illinois Action and b) the Committee succeeds in its fraudulent conveyance action before this Court. Therefore, we deny the Committee's request.

## IV. CONCLUSION

For the foregoing reasons, we deny the motion of the Debtors for a preliminary injunction of the Illinois Action. We also deny the motion of the Creditors' Committee to compel Ralin to put the proceeds of the Illinois Action, if any, into escrow.